UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANDRÉS OSWALDO | * | |
| BOLLAT VASQEUZ, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:20-cv-10566-IT |
| | * | |
| CHAD F. WOLF, Acting Secretary | * | |
| of Homeland Security, et al., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER
May 14, 2020

TALWANI, D.J.

I.      Introduction

       Pending before the court is Plaintiffs' Motion for Preliminary Injunction [#27] seeking an

order that five Plaintiffs currently in Mexico pursuant to the government's Migrant Protection

Protocol ("the Returned Plaintiffs") be paroled in to the United States for the pendency of their

immigration removal proceedings or, in the alternative, that they be provided with an assessment

of their fear of remaining in Mexico that follows the procedures and standard for "reasonable

fear interviews." See 8 C.F.R. § 208.31. For the reasons that follow, Plaintiffs' Motion [#27] is

GRANTED in part. The Department of Homeland Security shall rescind the order returning the

Returned Plaintiffs to Mexico. The court leaves to the Department in the first instance the

determination of whether parole or detention in the United States is appropriate once the order

returning the Returned Plaintiffs to Mexico is rescinded.

II.    <u>Factual Background</u>

A.    <u>The Migrant Protection Protocol</u>

In December 2018, the Department of Homeland Security ("DHS") announced the imminent implementation of the Migrant Protection Protocol ("MPP"). Press Release, Kirstjen M. Nielsen, Sec'y, DHS, Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration: Announces Migration Protection Protocols (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/ secretary-nielsen-announces-historic-action-confront-illegal-immigration. Under the MPP, noncitizens "arriving in or entering the U.S. from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings." <u>Id.</u> DHS grounds its authority for this policy in the contiguous return provision at § 235 of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1225(b)(2)(C). <u>See</u> Memorandum from DHS, Policy Guidance for Implementation of the Migrant Protection Protocols 1 [#36-1]. Under MPP, a noncitizen is placed in standard removal proceedings under 8 U.S.C. §1229a[1] "rather than another applicable proceeding pursuant to the INA." <u>Id.</u>[2]

---

[1] These are commonly referred to as "Section 240" proceedings after the relevant INA provision.

[2] A January 28, 2019, document drafted by Customs and Border Protection entitled "MPP Guiding Principles" lists the following categories of noncitizens as "not amenable to MPP":

- Unaccompanied alien children,
- Citizens or nationals of Mexico,
- Aliens processed for expedited removal,
- Aliens in special circumstances:
  - Returning LPRs seeking admission (subject to INA section 212)
  - Aliens with an advance parole document or in parole status
  - Known physical/mental health issues
  - Criminals/history of violence
  - Government of Mexico or USG interest,
- Any alien who is more likely than not to face persecution or torture in Mexico, or
- Other aliens at the discretion of the Port Director

Noncitizens who affirmatively assert a "concern that [they] may face a risk of persecution on account of a protected ground or torture upon return to Mexico" are referred to a U.S. Citizenship and Immigration Services ("USCIS") asylum officer for "an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico." Memorandum from USCIS, Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols ("USCIS Guidance for Implementing MPP") 4 [#36-3]. There is no right to have counsel present, and, "provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." Id. The result of the assessment "shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion," but there is no "further administrative review, reopening, or reconsideration of the assessment by USCIS." Id. at 5.

      B.    The Plaintiffs

          1.    Massachusetts Plaintiffs

Plaintiffs Andrés Oswaldo Bollat Vasquez, José Manuel Urias Martinez, and Salomé Olmos Lopez live in Massachusetts. Complaint 3-4 [#1]. Mr. Bollat Vasquez brings suit individually and as next friend to Luisa Marisol Vasquez de Bollat and their son, A.B. Id. at 3. Mr. Urias Martinez brings suit individually and as next friend to his mother, Rosa Maria Martinez de Urias. Id. at 4. Mr. Olmos Lopez brings suit individually and as next friend to his

---

Customs and Border Protection, "MPP Guiding Principles" [#36-2].

niece, Evila Floridalma Colaj Olmos, and her minor daughter, J.C. Id. at 4.[3]

          2.      The Returned Plaintiffs

Each of the Returned Plaintiffs crossed the border from Mexico into the United States between border checkpoints and was subsequently apprehended and detained by U.S. officials. Affidavit of Luisa Marisol Vasquez Perez de Bollat ("Vasquez Aff.") ¶¶ 3-5 [#29-2]; Affidavit of Evila Floridalma Colaj Olmos ("Colaj Aff.") ¶¶ 5-7 [#29-6]; Affidavit of Rosa Maria Martinez de Urias ("Martinez Aff.") ¶¶ 7-8 [#29-4]; see also Transcript of April 30, 2020, Hearing ("Tr.") 36:12-16 [#40]. DHS determined that the Returned Plaintiffs were inadmissible due to a lack of valid entry documents pursuant to 8 U.S.C. § 1182(a)(7).[4] Immigration Charging Documents 4, 6, 8[5] [#29-7]. DHS initiated removal proceedings against each of the five Plaintiffs under 8 U.S.C. § 1229a,[6] and, pursuant to the Migrant Protection Protocol, brought them to a bridge at the U.S.-Mexico border and handed them over to Mexican officials, who walked them over the bridge to Matamoros, Tamaulipas, Mexico, to await the adjudication of their cases. Vasquez Aff. ¶¶ 9-13 [#29-2]; Colaj Aff. ¶ 13 [#29-6]; Martinez Aff. ¶¶ 13-14 [#29-4]; Immigration Charging Documents 2-9 [#29-7].

Matamoros is located in the state of Tamaulipas, which the U.S. State Department has assigned a "Level 4: Do Not Travel" warning "due to crime and kidnapping." See U.S. Dep't of State—Bureau of Consular Affairs, Mexico Travel Advisory ("State Dep't Advisory"),

---

[3] The court refers to Ms. Vasquez, A.B., Ms. Colaj, J.C., and Ms. Martinez collectively as "the Returned Plaintiffs."

[4] Section 212 of the INA, cited in the Notices to Appear, is codified at 8 U.S.C. § 1182.

[5] Plaintiffs have only submitted the Notices to Appear for Ms. Vasquez, Ms. Martinez, and Ms. Colaj. Counsel states that the documents for A.B. match his mother's and that, on information and belief, documents for J.C. that match her mother's would have been issued. Affidavit of Adriana LaFaille ¶ 9 [#29].

[6] Section 240 of the INA, cited in the Notices to Appear, is codified at 8 U.S.C. § 1229a.

travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html

(last visited May 10, 2020). U.S. government employees are prohibited from being outside in

Matamoros between midnight and 6 a.m. and cannot travel between cities in Tamaulipas on

interior highways. Id.[7]

The Returning Plaintiffs provide the following individual accounts through their affidavits.

a.     Evila Floridalma Colaj Olmos and her minor daughter, J.C

Evila Floridalma Colaj Olmos ("Ms. Colaj"), and her four-year old daughter, J.C., are

nationals of Guatemala. See Colaj Aff. ¶ 1 [#29-6]. They had never been in Matamoros before

late July 2019, when they were "returned" there, with the clothing they were wearing and

paperwork from the U.S. and Mexican governments, and without their spare clothes and

shoelaces, which had been removed while in U.S. custody. Id. ¶¶ 13-14 [#29-6]. For a month,

Ms. Colaj and J.C. slept by the side of the road in a small park and relied on strangers for food.

---

[7] Plaintiffs have filed the Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico ("Martin Dec.") [#29-11] and the Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First ("Kizuka Dec.") [#29-12] as additional evidence of the conditions in Matamoros for returned migrants. Mr. Martin explains that "[t]he criminal groups that control [Tamaulipas] view migrants as a commodity and source of income and profit from each individual who passes through their territory. They deliberately pursue asylum seekers for kidnapping, extortion, and other forms of violence…Impunity is an issue across all of Mexico, but particularly so in Tamaulipas where the government does not have full control over public security. Migrants are an easy, low-risk target for the cartels as it is not noticed or reported if they are harmed or go missing." Martin Dec ¶¶ 8-9 [#29-11] (internal citations omitted). Mr. Kizuka reports that on his "first visit to the Matamoros encampment in September 2019, food and potable water remained scarce, some individuals were defecating in an open field because the site lacked latrines, and…[he] witnessed a decomposing corpse wash up along the Mexican side of the Rio Grande where children were bathing and adults were washing clothing." Kizuka Dec. ¶ 44 [#29-12]. On his return in January 2020, "the encampment had expanded onto the muddy banks of the Rio Grande to accommodate a growing population, while conditions improved little." Id. at ¶ 45. Moreover, "[a]s a result of overcrowding and poor sanitary conditions, disease is rampant" and "[a]ccess to food remains a problem, with doctors having treated pediatric patients suffering from severe-acute malnutrition, which increases the likelihood that an underfed child will die from flu, gastrointestinal infection, or other normally treatable conditions." Id. at ¶¶ 46-47 (internal citations omitted).

Id. at ¶ 17. J.C. was coughing and feverish. Id. at ¶¶ 14, 16. After two weeks, Ms. Colaj borrowed a phone to call her family, so that they knew where she was and she could ask them to send her money. Id. at ¶ 20. After the first month, a pastor gave Ms. Colaj and J.C. a small tent, which they have slept in ever since. Id. at ¶ 21. As more migrants were returned from the United States, a camp formed. Id. at ¶ 18.

In September 2019, two men approached Ms. Colaj and demanded that she give them 5000 pesos. Id. at ¶ 22. She told them she did not have the money. Id. A week and a half later, when she went with a friend to fetch water from the river, the two men intercepted them and again demanded money. Id. at ¶ 24. One man dragged the friend away and the other knocked Ms. Colaj to the ground and raped her. Id. He threatened to kill her if she went to the authorities. Id. Ms. Colaj has not seen her friend since. Id. at ¶ 26. For months, she continued to see the men just outside the encampment. Id. at ¶ 38.

Two days after the rape, Ms. Colaj and her daughter were required to appear at the border-crossing footbridge at 4:30 a.m. to attend their first court hearing, at which they appeared by video. Id. at ¶¶ 27-28. At that hearing, the attorney Ms. Colaj's family had retained requested that she be interviewed about her fear of returning to Mexico. Id. at ¶ 29. She was interviewed, without counsel present, and described what had happened to her two days earlier. Id. ¶ 29. After several hours, she was returned to Matamoros. Id. at ¶ 30. At her November hearing, she requested a second interview, and was provided with one. Id. at ¶ 33. She could not bring herself to tell about the rape again after apparently being disbelieved the first time, and she and her daughter were again returned to Mexico. Id. Ms. Colaj's next hearing was set for January 2020, but when she appeared, it was rescheduled to March because the court did not have an interpreter. Id. at ¶ 34. The March hearing was then reset for May because of the spread of the

novel coronavirus. Id. at ¶ 35.

Ms. Colaj continues to live at the migrant encampment in Matamoros, leaving only to buy food or medicine, and constantly afraid. Id. at ¶¶ 36-37, 39. The encampment itself is dirty and overcrowded. Id. at ¶ 45. There are frequent fights, and Ms. Colaj has heard about children being kidnapped and women being raped in their tents. Id. at ¶¶ 41-42. She and J.C. often hear gunshots nearby, and once heard a longer shootout, which she understood to be between the police and a cartel. Id. at ¶ 43. Ms. Colaj is too afraid to sleep until she begins to hear the sounds of other migrants waking up. Id. at ¶¶ 44, 48. She has little appetite and frequent headaches. Id. at ¶ 48. Her daughter is thin and often sick, and says she is "too sad to eat." Id. at ¶ 49.

> b.    Luisa Marisol Vasquez Perez de Bollat, her minor son, A.B.

Luisa Marisol Vasquez Perez de Bollat ("Ms. Vasquez") and her five-year old son, A.B., are both Guatemalan nationals. See Vasquez Aff. ¶ 1 [#29-2]. In September 2019, they were "returned" to Matamoros, Mexico, a city they had never been to and in which they knew no one. Id. at ¶¶ 12, 14. After spending a night in a hotel as the guests of another migrant, Ms. Vasquez's husband arranged for a friend to drive them twenty hours to the state of Sinaloa,[8] where they paid to stay with the friend and his family in their small house. Id. at ¶¶ 18-21. They remained there for six months, rarely going outside due to the frequency with which they heard gunshots nearby. Id. at ¶¶ 21-22.

In October 2019 and again in February 2020, Ms. Vasquez and her son were required to present themselves at the footbridge in Matamoros at 4:30 a.m. in order to attend their

---

[8] The U.S. State Department has assigned Sinaloa a "Level 4: Do Not Travel" warning "due to crime." See U.S. Dep't of State—Bureau of Consular Affairs, Mexico Travel Advisory, travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html (last visited May 10, 2020).

immigration court hearings. Id. at ¶ 28. Her husband paid a friend and another driver to take them on the twenty-hour trip, wait for them while they appeared in court, and drive them back to Sinaloa. Id. at ¶ 29. On one trip, Mexican officials stopped them at a checkpoint and threatened to destroy the documents that gave them permission to be in the country. Id. at ¶ 30.

In March, as Mexico began to shut down due to the spread of the novel coronavirus, Ms. Vasquez and her son, fearing that they would otherwise be unable to travel to their next court hearing, returned to Matamoros. Id. at ¶ 31. They are now staying in a house there that they found with the assistance of a pastor. Id. at ¶ 32. Ms. Vasquez ventures outside only to buy groceries, fearing the violence she has read about in the news and the armed men she sees in the street. Id.

c.    Rosa Maria Martinez de Urias

Rosa Maria Martinez de Urias ("Ms. Martinez") is a national of El Salvador. See Martinez Aff. ¶ 1 [#29-4]. In late September 2019, she and her five-year-old granddaughter were "returned" to Matamoros, a city in which they had never been and did not know anyone. Id. at ¶¶ 7, 11, 13-16. Ms. Martinez is a 2018 cancer survivor who has had multiple surgeries, and her granddaughter has a heart defect, for which she had surgery in 2017, and which requires close monitoring. Id. at ¶¶ 4-5. After being processed by Mexican officials, they were released and discovered that a migrant encampment had formed in the fenced-in area around the government building. Id. at ¶¶ 15-16. They remained there, sleeping on a piece of cardboard given to them by a stranger, huddling against the side of the building to keep out of the rain until an official would ask them to move farther away. Id. at ¶¶ 16-17. After four nights, someone gave them a small tent. Id. at ¶ 19. In the month leading up to their first court hearing in October 2019, Ms. Martinez and her granddaughter waited in the hot sun for an hour and a half each day to receive

food, though sometimes it ran out before they reached the front of the line, and used discarded juice containers to get water from a water truck, which Ms. Martinez would then use to bathe her granddaughter behind some parked cars. Id. at ¶¶ 11, 21. They had to appear at the footbridge at 4:30 a.m. to attend their immigration court hearing, at which they were provided with a subsequent court date in February of 2020 and sent back to Mexico. Id. at ¶¶ 22-23.

In November of 2019, Ms. Martinez felt "desperate to take [her] granddaughter out of that situation," and in January 2020, Ms. Martinez and her granddaughter unlawfully crossed into the United States a second time. Id. at ¶¶ 25, 29. After being apprehended by authorities, they were separated. Id. at ¶ 30. Ms. Martinez was again returned to Mexico, while her granddaughter was sent to a shelter and, eventually, reunited with her father in Massachusetts. Id. at ¶¶ 31, 33.

Back at the encampment in Matamoros, Ms. Martinez no longer has a tent. Id. at ¶ 34. She sometimes stays in a friend's tent or with another friend who is renting a room. Id. The encampment itself has been moved outside of the fenced area by the government complex. Id. at ¶ 40. At her immigration court hearing in February, she was represented by a lawyer, hired by her children, with whom she had never spoken. Id. at ¶¶ 35-36. The lawyer requested that Ms. Martinez be interviewed about her fear of returning to Mexico. Id. at ¶ 37. Ms. Martinez described her experiences in Mexico to an official over the phone, and was returned to Mexico later that day, sometime after dark. Id. at ¶¶ 37-38. She continues to reside at the migrant encampment, often too frightened to sleep, and tries to venture out into Matamoros as little as possible. Id. at ¶¶ 39-40.[9]

---

[9] The court has not taken into account additional information provided by Ms. Martinez under seal as that information is not necessary for purposes of this motion.

III.    Legal Standard

A preliminary injunction is an "extraordinary remedy never awarded as of right," Winter

v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008), appropriate where a plaintiff demonstrates

that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest." Id. at 20.

IV.    Analysis

A.    Likelihood of Success on the Merits

The court turns first to Plaintiffs' likelihood of success on the merits, which "is the main

bearing wall of the four-factor framework." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102

F.3d 12, 16 (1st Cir. 1996). Although Plaintiffs raise several different claims, the court need only

address the statutory arguments here.

1.    The Statutory Scheme Applicable to "Applicants for Admission"

The Immigration and Nationality Act ("INA"), as amended, lays out the main statutory

scheme for our nation's immigration laws. See 8 U.S.C. § 1101 et seq. Section 235 of the INA,

codified at 8 U.S.C. § 1225, addresses the processing of certain noncitizens considered

"applicants for admission." An "applicant for admission" is an "alien present in the United States

who has not been admitted or who arrives in the United States (whether or not at a designated

port of arrival and including an alien who is brought to the United States after having been

interdicted in international or United States waters)." 8 U.S.C. § 1225(a)(1).

Subsection (b) is entitled "Inspection of applicants for admission." Its first paragraph is

entitled "Inspection of aliens arriving in the United States and certain other aliens who have not

been admitted or paroled," and provides in relevant part:

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien…who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C)[10] or 1182(a)(7)[11] of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien…who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution,[12] the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

**(iii) Application to certain other aliens**

**(I) In general**

The Attorney General[13] may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

**(II) Aliens described**

An alien described in this clause is an alien who…has not been admitted or

---

[10] 8 U.S.C. § 1182(a)(6)(C) makes inadmissible an alien who by fraud misrepresents a material fact to obtain admission into the United States.

[11] 8 U.S.C. § 1182(a)(7) makes inadmissible an immigrant not in possession of a valid visa, reentry permit, or other valid entry document.

[12] Under 8 U.S.C. § 1158(b)(1)(B)(i), asylum applicants must establish that they are "refugees" within the meaning of 8 U.S.C. § 1101(a)(42)(A) by establishing "that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant[s]." This definition draws upon the 1967 Protocol Relating to the Status of Refugees, to which the United States is a party, and which incorporates Article 33 of the 1951 Convention Relating to the Status of Refugees, which states that: "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[13] Although the statute allocates this authority to the Attorney General, Congress has transferred this authority to the Secretary of Homeland Security. See 6 U.S.C. §§ 251, 552(d); Clark v. Suarez Martinez, 543 U.S. 371, 374 n.1 (2005). The court reads the text of the statute accordingly.

paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

**(B) Asylum Interviews**

**(i) Conduct by asylum officers**

An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

**(ii) Referral of certain aliens**

If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)),[ [14] ] the alien shall be detained for further consideration of the application for asylum.

**(iii) Removal without further review if no credible fear of persecution**

**(I) In general**

Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

…

**(v) "Credible fear of persecution" defined**

For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.

---

[14] Under the implementing regulations at 8 C.F.R. § 208.30(d), "[t]he purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." The inclusion of "torture" keeps the United States in line with its duty under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), to which it is a party, and which provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." See Matter of G-A-, 23 I&N Dec. 366, 367 (BIA 2002) ("Article 3 of the Convention Against Torture prohibits refoulement of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official"). The regulations provide that "an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17." 8 C.F.R. § 208.30(e)(3).

…

### (E) "Asylum officer" defined

As used in this paragraph, the term "asylum officer" means an immigration officer who--

(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title, and

(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

…

8 U.S.C. § 1225(b)(1).

Subsection (b)'s second paragraph, "Inspection of other aliens," in turn, provides in relevant part:

### (A) In general

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

### (B) Exception

Subparagraph (A) shall not apply to an alien--

(i) who is a crewman,

(ii) to whom paragraph (1) applies, or

(iii) who is a stowaway.

### (C) Treatment of aliens arriving from contiguous territory

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2).[15]

---

[15] The third paragraph, entitled "Challenge of Decision," see 8 U.S.C. § 1225(b)(3), is not relevant here.

2.      Whether the Returned Plaintiffs Were "Arriving" When They Were
Apprehended

Plaintiffs argue that, under the MPP, the contiguous return provision found at 8 U.S.C.

§ 1225(b)(2)(C) was improperly applied to the Returned Plaintiffs (Ms. Vasquez, A.B., Ms.

Colaj, J.C., and Ms. Martinez) because they were not "arriving" in the United States when they

were apprehended but, rather, had already entered. Supplemental Brief in Support of Plaintiffs'

Motion for Preliminary Injunction ("Pls.' Supp. Br.") 1 [#44]; see also Plaintiffs' Memorandum

of Law in Support of Motion for Preliminary Injunction ("Pls.' Mem.") 16 [#28]. Defendants do

not dispute that the Returned Plaintiffs were apprehended after they had crossed the border, Tr.

36:12-16 [#40],[16] but contend that the Returned Plaintiffs were nonetheless "arriving" as the term

is used in § 1225. Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for

Preliminary Injunction ("Defs.' Supp. Br.") 1 [#42].

There is a longstanding distinction in our immigration law between noncitizens who have

entered the United States, even if unlawfully, and those who remain at the threshold. See

Zadvydas v. Davis, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has

effected an entry into the United States and one who has never entered runs throughout

immigration law"); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)

(distinguishing between "aliens who have once passed through our gates, even illegally" and "an

alien on the threshold of initial entry").

---

[16] On Ms. Vasquez's Notice to Appear, the Department of Homeland Security marked the box
indicating that she is "an alien present in the United States who has not been admitted or
paroled" rather than the box indicating that she is "an arriving alien." Immigration Charging
Documents 2 [#29-7]. On the Notice to Appear for Ms. Colaj, DHS did not mark any of the three
available boxes to indicate whether she is "an arriving alien," "an alien present in the United
States who has not been admitted or paroled," or that she has been admitted to the United States
but is removable. Id. at 8. The Notice to Appear for Ms. Martinez similarly has none of the boxes
marked. Id. at 6.

Plaintiffs argue that the plain language of the contiguous return provision, and, indeed, all of 8 U.S.C. § 1225, is consistent with that longstanding distinction between noncitizens who have entered the United States and those who remain at the threshold. Pls.' Supp. Br. 2-3 [#44]. Section § 1225(a) expressly tracks that division, specifying in its title[17] that it addresses the "[i]nspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled" and then explicitly including in the definition of "applicants for admission" both a noncitizen who is "present in the United States who has not been admitted" and one "who arrives in the United States (whether or not at a designated port of arrival...)." The expedited removal provision at § 1225(b)(1) similarly distinguishes between, on the one hand, "arriving" noncitizens and, on the other hand, those who are "present," but have "not been admitted or paroled" and cannot demonstrate that they have been physically within the United States for at least two years. In contrast, the contiguous return provision at § 1225(b)(2)(C) contains no language providing for return of individuals who are already present in the United States. The title of that subsection similarly specifies that it addresses "aliens arriving from contiguous territory." 8 U.S.C. § 1225(b)(2)(C).

It is a well-established cannon of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570 (1995). Where "arriving" noncitizens are distinguished from those "present" for less than two years in § 1225(b)(1), the term "arriving" cannot be understood to include noncitizens "present" for less than two years in § 1225(b)(2)(C).

---

[17] See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 47 (2008) ("To be sure, a subchapter heading cannot substitute for the operative text of the statute ... [T]he title of a statute ... cannot limit the plain meaning of the text. Nonetheless, statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute") (internal quotations and citations omitted).

Defendants argue, however, that "a holding that aliens who illegally cross the border are no longer 'arriving' within the meaning of 8 U.S.C. § 1225(b)(2)(C) would impermissibly render the phrase 'whether or not at a designated port of arrival' in 8 U.S.C. § 1225(b)(2)(C) completely meaningless" because, "as a practical matter, 8 U.S.C. § 1225(b)(2)(C) could never be applied to aliens who enter between ports of entry." Defs.' Supp. Br. 1-2 [#42] (citing Lopez-Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999) ("It is a time-honored tenet that all words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous")). The statutory interpretation question, however, is not whether it is practical to apprehend aliens who are crossing the border at some point other than a designated port of arrival, but simply whether DHS may treat an applicant as "arriving" after they have already entered the United States. Under the statutory language, if applicants are apprehended while crossing the border (whether or not at a check point), they are "arriving" applicants under the statute, and if apprehended at some point thereafter, they are not "arriving," but rather "alien[s] present in the United States who [have] not been admitted." 8 U.S.C. § 1225(a)(1). That DHS does not commonly apprehend noncitizens in the act of crossing does not convert the phrase "whether or not at a designated port of arrival" into surplusage.[18]

The "practical matter" raised by DHS may well have guided the agency's 1997 adoption of a regulation limiting the use of the contiguous return provision to individuals arriving in the

---

[18] Similarly, the fact that "DHS, after surveying relevant statistics, has found that the vast majority of aliens apprehended by the U.S. Border Patrol along the Southwest Border are apprehended within 96 hours of crossing the land border," and that "DHS issued guidance reasonably advising that aliens who enter between ports of entry may only be processed for MPP if they have been in the country for less than 96 hours," Defs.' Supp. Br. 2 [#42], does not alter the statutory meaning of the term "arriving" to include the recently arrived.

United States at designated points of entry. In January 1997, during the rulemaking conducted after the passage of the law now codified in 8 U.S.C. § 1225,[19] the Immigration and Naturalization Service ("INS") explained that, in some instances, the new law "distinguishes between the broader term 'applicants for admission' and a narrower group, 'arriving aliens.'" 62 Fed. Reg. 444, 445 (Jan. 3, 1997). The INS explained that the proposed regulatory definition of "arriving alien" included aliens arriving at a port-of-entry, interdicted at sea, or previously paroled upon arrival," but requested comment on this definition as it "could also include other classes of aliens, e.g., those apprehended crossing a land border between ports-of-entry." Id. Two months later, in adopting the interim regulation that did not include those apprehended crossing a land border between ports-of-entry, the INS explained that "the statute seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States." 62 Fed. Reg. 10312, 10313 (Mar. 6, 1997). The INS also rejected a commentator's suggestion that the regulatory definition be expanded to include aliens who have been present for less than 24 hours in the United States without inspection and admission. Id. Practical concerns may have factored into the agency's adoption of a regulation limiting "arriving aliens" to those crossing the border at a port of entry or interdicted at sea. The practical concern does not, however, support reading the statute to ignore its plain distinction between "arriving aliens" and those present in the United States.

Thus, as there is no dispute that the Returned Plaintiffs were apprehended after they had crossed the border, the court finds that Plaintiffs have demonstrated a likelihood of success on the merits as to their contention that the Returned Plaintiffs do not belong to the subgroup of

---

[19] This statute was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). See Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 302, 309(b), 110 Stat. 3009 (1996).

applicants subject to the contiguous return provision in § 1225(b)(2)(C) because, at the time of

their apprehension by CBP, they were not "arriving on land."

       3.   <u>Whether the Returned Plaintiffs Are Applicants for Admission as Specified in 8 U.S.C. § 1225(b)(1) to Whom 8 U.S.C. § 1225(b)(2) Does Not Apply</u>

Having found that the DHS's return of Ms. Vasquez, A.B., Ms. Colaj, J.C., and Ms.

Martinez to Mexico under the MPP likely violates the plain language of 8 U.S.C. §

1225(b)(2)(C) because the Returned Plaintiffs were not "arriving on land," the court need not

reach Plaintiffs' other claims. However, assuming, *arguendo*, that the Returned Plaintiffs could

be considered "arriving" within the meaning of § 1225, the court addresses a second statutory

argument as an alternative ground.

Plaintiffs contend that the Returned Plaintiffs are not noncitizens "described in

subparagraph (A)," that is, § 1225(b)(2)(A), to whom the contiguous return authority may be

applied, <u>see</u> 8 U.S.C. § 1225(b)(2)(C), but, rather, are explicitly excluded from the group of

"other aliens" described in § 1225(b)(2)(A) because they are applicants "to whom paragraph (1)

applies." Pls.' Mem. 14-16 [#28] (citing 8 U.S.C. § 1225(b)(2)(B)(ii)). Defendants argue that the

groups of noncitizens subject to (b)(1) and (b)(2) "overlap," and that "§ 1225(b)(2) can be

applied to all aliens to whom § 1225(b)(1) can be applied." Defs.' Opp'n 8 [#35]. It is, thus, in

Defendants' view, "DHS's exercise of discretion [that] governs whether applicants for admission

are placed in expedited removal proceedings under § 1225(b)(1) or § 1229a removal proceedings

under § 1225(b)(2)," and that the decision to place them in § 1229a removal proceedings under §

1225(b)(2) allows DHS to apply the contiguous return provision to the Returned Plaintiffs.

Defs.' Opp'n 7 [#35].

Section 1225(b) differentiates between the "inspection" of applicants for admission

described in (b)(1) and those described in (b)(2). <u>See</u> <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830, 837

(2018) ("applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)"). A section (b)(1) applicant is one who is "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." Jennings v. Rodriguez, 138 S. Ct. 830, 837 (2018); see also § 1225(b)(1)(A)(i) (citing 8 U.S.C. §§ 1182(a)(6)(C) and 1182(a)(7)). When such applicants are "arriving in the United States," § 1225(b)(1), they are placed into what are known as "expedited removal" proceedings unless they express a fear of persecution or an intention to claim asylum, 8 U.S.C. §§ 1225(b)(1)(A)(i) and 1225(b)(1)(A)(ii), or the Secretary of Homeland Security exercises prosecutorial discretion and places them into "standard" removal proceedings under 8 U.S.C. § 1229a. See Matter of E-R-M- and L-R-M-, 25 I. & N. Dec. 520, 523-24 (BIA 2011); see also Matter of M-S-, 27 I. & N. Dec. 509, 510 (BIA 2019); Innovation Law Lab v. Wolf ("Innovation II"), 951 F.3d 1073, 1084 (9th Cir. 2020). The Secretary of Homeland Security may also elect to process through "expedited removal" any (b)(1) noncitizens who are present in the United States without having been admitted or paroled and who cannot affirmatively demonstrate that they have been continuously present in the country for two years. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1225(b)(1)(A)(iii).

A section (b)(2) applicant is, as the statute puts it, an "other alien[]." 8 U.S.C. § 1225(b)(2). Section (b)(2) "serves as a catchall provision" and "applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)." Jennings, 138 S. Ct. at 837; see also 8 U.S.C. §1225(b)(2)(B)(ii). "Other aliens" includes aliens present in the United States who have not been admitted or paroled and who are inadmissible for reasons other than fraud, misrepresentation, or lack of valid documentation, or who can demonstrate that they have been present in the United States for more than 2 years, and arriving aliens who are

inadmissible for reasons other than fraud, misrepresentation, or lack of valid documentation.[20] 8 U.S.C. § 1225(b)(1)(A). Any (b)(2) applicants who are "not clearly and beyond a doubt entitled to be admitted" are processed not through "expedited removal" proceedings, but through standard removal proceedings under 8 U.S.C. §1229a. 8 U.S.C. § 1225(b)(2)(A).

Defendants identify "the crux" of the issue as being "whether a (b)(1) applicant is an individual actually placed in (b)(1) proceedings, or an individual eligible to be placed in (b)(1) proceedings, but who is placed in proceedings pursuant to § 1225(b)(2) instead." Defs.' Opp'n 9 [#35]. This misstates the question. Section (b)(1) applicants are not defined by the proceedings to which they are ultimately subject but, rather, by their status as noncitizens arriving or present in the United States for less than two years whom "an immigration officer determines…is inadmissible under section 1182(a)(6)(C) or 1182(a)(7)…" See Jennings, 138 S. Ct. at 837 ("Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation"). The Returned Plaintiffs, who were determined to be inadmissible under 8 U.S.C. § 1182(a)(7) because they lacked valid entry documents, are § (b)(1) applicants.[21] See Pls.' Mem. 16 [#28].

---

[20] Other grounds include having a significant communicable disease, 8 U.S.C. § 1182(a)(1)(A)(i), having been determined to be a drug addict, 8 U.S.C. § 1182(a)(1)(A)(iv), having been convicted of a felony involving moral turpitude or controlled substances, 8 U.S.C. § 1182(a)(2)(A)(i), having been convicted of crimes with aggregate sentences of confinement of 5 years or more, 8 U.S.C. § 1182(a)(2)(B), having engaged in human trafficking, 8 U.S.C. § 1182(b)(2)(H), having engaged in money laundering, 8 U.S.C. § 1182(b)(2)(I), having engaged in terrorist activity, 8 U.S.C. § 1182(b)(3)(B), having participated in genocide, 8 U.S.C. § 1182(b)(3)(E), and so on.

[21] The Returned Plaintiffs are (b)(1) applicants whether they are considered to have been "arriving" or "present" for less than two years without having been admitted or paroled at the time of their apprehension. See 8 U.S.C. § 1225(b)(1)(A)(i) (including a noncitizen who is "arriving in the United States or is described in clause (iii)"); 8 U.S.C. § 1225(b)(1)(A)(iii)(II) ("An alien described in this clause is an alien…who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period

Moreover, while the DHS does, indeed, have the discretion to place § (b)(1) applicants into standard § 1229a removal proceedings, see Matter of E-R-M- and L-R-M-, 25 I. & N. Dec. 520, 523-24 (BIA 2011); see also Matter of M-S-, 27 I. & N. Dec. 509, 510 (BIA 2019); Innovation II, 951 F.3d 1073, 1084 (9th Cir. 2020), it does not do so "under" or "pursuant to" § 1225(b)(2). In Matter of E-R-M- and L-R-M-, on which Defendants rely, see Defs.' Opp'n 7 [#35], the Board of Immigration Appeals held only that the DHS has the discretion to place § (b)(1) noncitizens into standard § 1229a removal proceedings, not that such placement is pursuant to § 1225(b)(2). The Board interprets the § 1225(b)(2)(B) "exception" to the group of noncitizens to whom § 1225(b)(2)(A) applies to mean that the "three classes of aliens" excepted, "including those subject to expedited removal under section [1225](b)(1)(A)(i), are not *entitled* to a section [1229a] proceeding, *not* that these classes of aliens may not be placed in such proceedings," and that "aliens like the respondents who are subject to section [1225](b)(1)(A)(i)…may nevertheless be placed in section [1229a] proceedings at the election of the DHS." 25 I. & N. Dec. 520, 523-24 (BIA 2011) (emphasis in original). Thus, as the 9th Circuit recently affirmed, "the fact that an applicant is in removal proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a." Innovation II, 951 F.3d at 1084.

Because the Returned Plaintiffs are applicants for admission described in § (b)(1), they are not subject to the contiguous return provision at 8 U.S.C. § 1225(b)(2)(C), which applies only to applicants for admission described in § (b)(2)(A).[22] They are, thus, likely to succeed on

---

immediately prior to the date of the determination of inadmissibility under this subparagraph").

[22] Put another way, because the Returned Plaintiffs are applicants "to whom paragraph (1) applies" such that "[s]ubparagraph (A) shall not apply" to them, see 8 U.S.C. § 1225(b)(2)(B)(ii),

the merits of their claim that their inclusion in the MPP is in violation of the INA for this reason as well.[23]

B.      Irreparable Harm, Equities, and the Public Interest

Having found that Plaintiffs are likely to succeed on the merits, the court turns to the three other factors relevant to the issuance of a preliminary injunction. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. at 20 (2008).

First, the Returned Plaintiffs are likely to suffer irreparable harm if Defendants are not enjoined from maintaining their "return" to Mexico under the MPP. Ms. Vasquez, Ms. Colaj, and Ms. Martinez have all submitted sworn affidavits attesting to the ongoing hardships and extreme dangers they and their two young children face as they struggle to survive in Matamoros, Tamaulipas, Mexico. See Vasquez Aff. [#29-2]; Colaj Aff. [#29-6]; Martinez Aff. [#29-4]. While they wait for their removal proceedings to progress, Ms. Vasquez and her now-five-year-old son, A.B., venture out of their Matamoros housing only to buy groceries for fear of the violence outside. Vasquez Aff. at ¶¶ 31-32 [#29-2]. Ms. Colaj reports that she has been raped and threatened with death while staying in the migrant encampment, and that she and her five-year-old daughter, J.C., continue to live there, sleeping in a tent. Colaj Aff. ¶¶ 21, 24, 36-37, 39. [#29-6]. J.C. is thin, often sick, and tells her mother that she is "too sad to eat." Id. at ¶ 49. Ms.

_____

the provision addressing the return to a contiguous territory of "an alien described in subparagraph (A)" does not apply to them. See 8 U.S.C. § 1225(b)(2)(C).

[23] Plaintiffs also argue that extant regulations limit the contiguous return authority to (b)(2) noncitizens arriving at ports-of-entry, Pls.' Mem. 17-19 [#28], that implementing the MPP without notice-and-comment rulemaking violated the Administrative Procedure Act, Id. at 20-21, that the MPP is arbitrary and capricious in violation of the Administrative Procedure Act, Id. at 21-24, that the MPP is motivated by animus in violation of the Constitution's equal protection guarantee, Id. at 25-26, and that requiring the Returned Plaintiffs to remain in Mexico for the pendency of their removal proceedings violates the duty of non-refoulement. Id. at 26-28. The court does not reach these arguments.

Martinez is living in the migrant encampment without even her own tent for shelter and is often too frightened to sleep. Martinez Aff. ¶¶ 34, 39-40 [#29-4]. Their personal accounts are unrebutted[24] and are supported by affidavits from employees of two nongovernmental organizations[25] and the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping." See "State Dep't Advisory." While U.S. government employees are prohibited from being outside in Matamoros between midnight and 6 a.m., id., the Returned Plaintiffs are periodically required to appear at the border-crossing footbridge at 4:30 a.m. to attend their immigration court hearings. Vasquez Aff. ¶ 28 [#29-2]; Colaj Aff. ¶ 28 [#29-6]; Martinez Aff. ¶ 22 [#29-4].

Defendants contend that Plaintiffs' "delay in seeking relief undercuts their claims of irreparable harm." Defs.' Opp'n 26 [#35]. The court finds no such delay.[26] The Returned

---

[24] Defendants note that after "nonrefoulement interviews…Ms. Colaj and Ms. Martinez were not found to face a likelihood of torture or persecution on account of a protected ground if returned to Mexico." Opposition 23 [#35]; see also Assessment Notice [#29-10] (provided to Ms. Martinez after her February 13, 2020 "nonrefoulement interview," on which a box is marked next to the statement "You did not establish a clear probability of persecution or torture in Mexico"). The court can accord the interviewer's determination little weight here where Defendants have not stated what information was considered by the interviewer in reaching those conclusions and have offered no written or other record of the interview for the court to review.

[25] The observations about the vulnerability of migrants like the Returned Plaintiffs in Tamaulipas, and in Matamoros in particular, contained in the Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico [#29-11] and the Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First [#29-12] corroborate the Returned Plaintiffs' accounts of their own experiences. For example, Mr. Kizuka describes the conditions in the migrant encampment in Matamoros as "life-threatening." Kizuka Dec. 13-15 [#29-12]. Mr. Martin reports that his staff "has witnessed and received direct reports of numerous violent incidents involving migrants and asylum seekers. These include cases of sexual violence, robbery, verbal harassment of migrants by the local community, attempted kidnapping, disappearance and murder of migrants after leaving the camp, and violent aggression with weapons. [They] have also witnessed cartel watchmen observing migrants…" Martin Dec. ¶ 43 [#29-11]. Defendants have filed nothing that contradicts these accounts.

[26] Plaintiffs filed their Complaint [#1] on March 20, 2020. Plaintiffs and present counsel were not in contact until March 9, 2020. Declaration of Adriana LaFaille in Response to Government's Opposition to Expedited Scheduling 1 [#23]. Ms. Vasquez and Ms. Martinez have

Plaintiffs have demonstrated that they face daily peril such that there is a high likelihood they will suffer irreparable harm should the preliminary injunction not issue.

The court further finds that the balance of equities tips in favor of granting Plaintiffs' request for a preliminary injunction and that such a grant is in the public interest. Moving the Returned Plaintiffs out of the constant danger they face outweighs the government's or the public's interest in the continued application of the MPP to these five noncitizens, in light of the likelihood of success of Plaintiffs' claim that the MPP is inconsistent with 8 U.S.C. § 1225 as it applies to the Returned Plaintiffs.

V.    Conclusion

Accordingly, Plaintiffs' Motion for Preliminary Injunction [#27] is GRANTED in part. The Department of Homeland Security shall promptly rescind the orders returning Ms. Vasquez, A.B., Ms. Colaj, J.C., and Ms. Martinez to Mexico and shall permit their re-entry into the United States for the pendency of their immigration removal proceedings. The court leaves to the Department in the first instance the determination whether parole or detention is appropriate

---

attested to the difficulty they face communicating with the attorneys their families hired to represent them in their immigration proceedings. See Vasquez Aff. ¶ 26 [#29-2]; Martinez Aff. ¶¶ 22, 36 [#29-4]. Moreover, the court finds no evidence of delay between Plaintiffs' filing of their Complaint [#1] and their Motion for Preliminary Injunction [#27]. See Defs.' Opp'n 26 [#35]. Plaintiffs contacted the government on the afternoon of their initial March 20, 2020, filing "to confer about the possibility of an agreed-to resolution," learned April 1, 2020, that no such agreement would be possible. Plaintiff's Motion to Expedite Preliminary Injunction Proceedings 1 [#19]. On April 7, 2020, the government filed a Motion to Reassign the Case Pursuant to Local Rule 40.1(g) [#16] and Plaintiffs filed an Assented-to Motion for Leave to File Excess Pages [#18] and a Motion to Expedite Preliminary Injunction Proceedings 2 [#19] proposing to file a motion for a preliminary injunction the following day. On April 8, 2020, the court issued an Electronic Order [#20] indicating its intention to address the government's motion first and directing Plaintiffs to promptly file a response. The court denied the government's motion on April 10, 2020, Mem. and Ord. [#24], and granted Plaintiffs' Assented-to Motion for Leave to File Excess Pages [#18] on April 13, 2020. Elec. Ord. [#25]. Plaintiffs filed their Motion for Preliminary Injunction [#27] that same day.

once the Returned Plaintiffs are inside the United States and expresses no opinion as to the

authority under which the Returned Plaintiffs might be detained. The court does not reach

Plaintiffs' other arguments or alternative request that the Returned Plaintiffs be provided with an

assessment of their fear of remaining in Mexico that follows the procedures and standard for

"reasonable fear interviews." Pls.' Mem. 29 [#28].[27]

IT IS SO ORDERED.

Date:   May 14, 2020                                       /s/ Indira Talwani
                                                          United States District Judge

---

[27] The court notes, however, that a cursory review highlights why MPP's "nonrefoulement" interviews" described above may be inadequate and in any event, differ substantially from the "reasonable fear" interview process set forth under the regulations, where noncitizens subject to the "reinstatement" of a previous removal order or "administrative removal" as the result of certain criminal convictions, see 8 C.F.R. § 208.31(a), are evaluated to determine whether they should be referred to an immigration judge "for full consideration of the request for withholding of removal [under section 241 of the Immigration and Nationality Act or the Convention Against Torture] only." 8 C.F.R. § 208.31(e). First, to be referred to an immigration judge, a noncitizen must establish only a "reasonable possibility" of persecution or torture, see 8 C.F.R. § 208.31(c), while MPP's interviews require a "more likely than not" showing. USCIS Guidance for Implementing MPP 4 [#36-3]. Under the "reasonable fear" procedures, noncitizens "may be represented by counsel…and the alien's representative may present a statement at the end of the interview," 8 C.F.R. § 208.31(c), while DHS "is currently unable to provide access to counsel" during primary or secondary inspection under MPP "given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." USCIS Guidance for Implementing MPP 4 [#36-3]. The "reasonable fear" regulations require that a record of the interview be created and reviewed with the noncitizen. 8 C.F.R. § 208.31(c) ("The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture."). No record is required for the MPP interviews. Under the "reasonable fear" procedure, asylum officers' negative fear determinations are reviewable by immigration judges, 8 C.F.R. § 208.31(g), while the assessment under MPP "shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion," but there is no "further administrative review, reopening, or reconsideration of the assessment by USCIS." USCIS Guidance for Implementing MPP 5 [#36-3].