UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANDRÉS OSWALDO                    *
BOLLAT VASQEUZ, et al.,           *
                                  *
            Plaintiffs,           *
                                  *
      v.                          *        Civil Action No. 1:20-cv-10566-IT
                                  *
ALEJANDRO MAYORKAS, Secretary     *
of Homeland Security,[1] et al.,  *
                                  *
            Defendants.           *

MEMORANDUM AND ORDER
February 13, 2021

TALWANI, D.J.

I.      Introduction

      Pending before the court is Plaintiffs' Second Motion for Preliminary Injunction [#77]. As

with Plaintiffs' first Motion for Preliminary Injunction [#27], the motion seeks an order that

seven Plaintiffs currently in Mexico pursuant to the government's Migrant Protection Protocol be

paroled in to the United States for the pendency of their immigration removal proceedings or, in

the alternative, that they be provided with an assessment of their fear of remaining in Mexico

that follows the procedures and standard for "reasonable fear interviews." See 8 C.F.R. § 208.31.

For the reasons that follow, Plaintiffs' Motion [#77] is GRANTED in part. The Department of

Homeland Security shall rescind the orders returning these seven Plaintiffs to Mexico. The court

leaves to the Department in the first instance the determination of whether parole or detention in

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Secretary of the U.S. Department of Homeland Security
Alejandro Mayorkas has been substituted for former Acting Secretary of the U.S. Department of
Homeland Security Chad Wolf.

the United States is appropriate once the orders returning the seven Plaintiffs to Mexico are rescinded.

II.     Procedural Background

On March 20, 2020, five asylum seekers who were placed in the Migrant Protection Protocol and "returned" to Mexico for the duration of their immigration proceedings filed a Complaint [#1] seeking, *inter alia*, declaratory and injunctive relief that applying the Migrant Protection Protocol to the Plaintiffs was contrary to the Immigration and Nationality Act and its regulations, violated the Administrative Procedures Act, violated Defendants' Non-Refoulement Obligations, violated the Equal Protection Clause of the United States Constitution, and violated the substantive requirements of the Due Process Clause of the United States Constitution. Id. at 28-35.

Plaintiffs filed the first Motion for Preliminary Injunction [#27] on April 13, 2020. Plaintiffs sought an order that the five Plaintiffs in Mexico ("the Returned Plaintiffs") be paroled to the United States for the pendency of their immigration removal proceedings or, in the alternative, that they be provided with an assessment of their fear of remaining in Mexico that follows the procedures and standard for "reasonable fear interviews." See 8 C.F.R. § 208.31. Defendants opposed the Motion for Preliminary Injunction [#27]. Opposition re Motion for Preliminary Injunction [#35].

On May 14, 2020, the court granted the Motion [#27] in part. See Memorandum and Order ("Mem. & Order") [#45]. The court found that Plaintiffs demonstrated a likelihood of success on the merits as to their contentions that the Returned Plaintiffs do not belong to the subgroup of applicants subject to the contiguous return provision in § 1225(b)(2)(C) because, at the time of their apprehension by Customs and Border Patrol ("CBP"), they were not "arriving

on land." Id. at 18-17. The court also found that plaintiffs were likely to succeed on the merits of their claim that because Returned Plaintiffs are applicants for admission described in 8 U.S.C. § 1225(b)(1), they are not subject to the contiguous return provision at 8 U.S.C. § 1225(b)(2)(C).

The Defendants appealed. Notice of Appeal [#49]. After the Supreme Court granted certiorari in in Wolf v. Innovation Law Lab, Inc., 951 F.3d 1073, 1084 (9th Cir. 2020), cert. granted, No. 19-1212 (Oct. 19, 2020), the First Circuit held the appeal in abeyance pending a decision in that case.[2]

Meanwhile, Plaintiffs filed an Amended Complaint [#73] on December 22, 2020 which added seven new Plaintiffs. The Amended Complaint [#73] includes all counts from the Complaint [#1] except for the Due Process claim. Amended Complaint 35-40 [#73].  On December 25, 2020, Plaintiffs filed their Second Motion for Preliminary Injunction [#77], seeking an order that the seven new Plaintiffs be paroled to the United States for the pendency of their immigration removal proceedings or, in the alternative, that they be provided with an assessment of their fear of remaining in Mexico that follows the procedures and standard for "reasonable fear interviews." See 8 C.F.R. § 208.31. Defendants oppose the Second Motion for Preliminary Injunction [#77]. Opposition to Plaintiffs' Second Motion for a Preliminary Injunction [#88].

---

[2] The Supreme Court has recently granted a motion to hold further briefing in in abeyance and to remove the case from the February 2021 argument calendar. Innovative Lab, No. 19-1212 (Feb. 3. 2021).

III.    <u>Factual Background</u>

    A.    <u>The Migrant Protection Protocol</u>[3]

In December 2018, the Department of Homeland Security ("DHS") announced the imminent implementation of the Migrant Protection Protocols ("MPP"). Press Release, Kirstjen M. Nielsen, Sec'y, DHS, Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration: Announces Migration Protection Protocols (Dec. 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration. Under the MPP, noncitizens "arriving in or entering the U.S. from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings." <u>Id.</u> DHS grounds its authority for this policy in the contiguous return provision at § 235 of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1225(b)(2)(C). <u>See</u> Memorandum from DHS, Policy Guidance for Implementation of the Migrant Protection Protocols 1 [#36-1]. Under MPP, a noncitizen is placed in standard removal proceedings under 8 U.S.C. § 1229a[4] "rather than another applicable proceeding pursuant to the INA." <u>Id.</u> at 3.[5]

---

[3] The court begins with the background provided in its <u>Memorandum and Order</u> [#45].

[4] These are commonly referred to as "Section 240" proceedings after the relevant INA provision.

[5] A January 28, 2019, document drafted by Customs and Border Protection entitled "MPP Guiding Principles" lists the following categories of noncitizens as "not amenable to MPP":

- Unaccompanied alien children,
- Citizens or nationals of Mexico,
- Aliens processed for expedited removal,
- Aliens in special circumstances:
  - Returning LPRs seeking admission (subject to INA section 212)
  - Aliens with an advance parole document or in parole status
  - Known physical/mental health issues
  - Criminals/history of violence
  - Government of Mexico or USG interest,
- Any alien who is more likely than not to face persecution or torture in Mexico, or

Noncitizens who affirmatively assert a "concern that [they] may face a risk of persecution on account of a protected ground or torture upon return to Mexico" are referred to a U.S. Citizenship and Immigration Services ("USCIS") asylum officer for "an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico." Memorandum from USCIS, Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols ("USCIS Guidance for Implementing MPP") 4 [#36-3]. There is no right to have counsel present, and, "provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." Id. The result of the assessment "shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion," but there is no "further administrative review, reopening, or reconsideration of the assessment by USCIS." Id. at 5.

On February 2, 2021, the President of the United States signed an executive order instructing DHS to "'promptly review and determine whether to terminate or modify'" the MPP, and, "in coordination with the Secretary of State, the Attorney General, and the Director of the CDC, to 'promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subjected to MPP for further processing of their asylum claims.'" Second Motion for

---

- Other aliens at the discretion of the Port Director

Customs and Border Protection, "MPP Guiding Principles" 1-2 [#36-2].

Extension of Time to Respond to First Amended Complaint [#93] (quoting Exec. Order No. 14010, 86 FR 8267 (Feb. 2, 2021)).

    B.    <u>The Plaintiffs</u>

        1.    <u>Massachusetts Plaintiffs</u>

Plaintiffs Jorge Alberto Guevara Diaz, Mateo López, and Rosi Lisbeth Zuniga Posadas live in Massachusetts. Amended Complaint 5-6 [#73]. Mr. Guevara Diaz brings suit individually and as next friend to his wife Nora Idalia Alvarado Reyes and their children, J.G., S.G., and M.G. <u>Id.</u> at 5. Mr. López brings suit individually and as next friend to his brother and sister-in-law, Hermes Arnulfo López Merino and María de la Cruz Abarca de López and their children T.L., D.L, and A.L. <u>Id.</u> at 5. Ms. Zuniga Posadas brings suit individually and as next friend to her sister, Miriam Yanett Zuniga Posadas, her niece, G.Z., and her nephews, D.Z. and K.Z. <u>Id.</u> at 6.[6]

        2.    <u>The New Returned Plaintiffs</u>[7]

As with the Returned Plaintiffs, each of the New Returned Plaintiffs crossed the border from Mexico into the United States between border checkpoints and was subsequently apprehended and detained by U.S. officials. Reyes Dec. ¶¶ 4-5 [#79-2]; Declaration of María de la Cruz Abarca de López ("Abarca Dec.") ¶¶ 2-3 [#79-4]; "Zuniga Dec." ¶ 4 [#79-6]. DHS determined that the New Returned Plaintiffs were inadmissible due to a lack of valid entry

---

[6] Although J.G, S.G., M.G., D.Z., and K.Z. were initially placed in the MPP, these five children are now residing in Massachusetts. Declaration of Nora Idalia Alvarado Reyes ("Reyes Dec.") ¶¶ 4-12; 33; 41 [#79-2]; Declaration of Miriam Yanett Zuniga Posadas ("Zuniga Dec.") ¶¶ 4; 12-21; 48-50 [#79-6].

[7] The court referred collectively to the original Plaintiffs who had been returned to Mexico under the MPP as the "Returned Plaintiffs." Mem. & Order [#45]. The court refers to Ms. Reyes, Mr. López Merino, Ms. Abarca, A.L., T.L., D.L., and Ms. Zuniga, collectively as "the New Returned Plaintiffs."

documents pursuant to 8 U.S.C. § 1182(a)(7).[8] Immigration Charging Documents 2, 4, 6, 8, 10, 12, 14, 17 [#79-7]. DHS initiated removal proceedings against each of the seven Plaintiffs under 8 U.S.C. § 1229a,[9] and, pursuant to the MPP, brought them to bridges at the U.S.-Mexico border and handed them over to Mexican officials, who walked them over the bridges to Matamoros, Tamaulipas, Mexico, Reyes Dec. ¶¶ 7-15 [#79-2]; Abarca Dec. ¶ 9 [#79-4], and to Nuevo Laredo, Tamaulipas, Mexico, Zuniga Dec. ¶¶ 6-11 [#79-6], to await the adjudication of their cases. Immigration Charging Documents 2, 4, 6, 8, 10, 12, 14, 17 [#79-7].

Both Matamoros and Nuevo Laredo are located in the state of Tamaulipas, which the U.S. State Department has assigned a "Level 4: Do Not Travel" warning "due to crime and kidnapping." See U.S. Dep't of State—Bureau of Consular Affairs, Mexico Travel Advisory ("State Dep't Advisory"), travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html ("Organized crime activity—including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault—is common along the northern border.") (last visited February 8, 2021). U.S. government employees are prohibited from being outside in Matamoros and Nuevo Laredo between midnight and 6 a.m. and cannot travel between cities in Tamaulipas on interior highways. Id.[10]

---

[8] Section 212 of the INA, cited in the Notices to Appear, is codified at 8 U.S.C. § 1182.

[9] Section 240 of the INA, cited in the Notices to Appear, is codified at 8 U.S.C. § 1229a.

[10] Plaintiffs have filed the Supplemental Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico ("Martin Supp. Dec.") [#79-12] and the Supplemental Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First ("Kizuka Supp. Dec.") [#79-11] as additional evidence of the conditions in Matamoros and Nuevo Laredo for returned migrants. Mr. Kizuka explains that "[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP" and that "the security situation in Mexico, including in the state of Tamaulipas has worsened" with one of Mexico's "most powerful and violent cartels" reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted. Kizuka Supp. Dec. ¶¶ 4, 11-15 [#79-11A]. Mr. Kizuka also reports that conditions have only worsened from when

The New Returned Plaintiffs provide the following individual accounts through their declarations.

a.    <u>Nora Idalia Alvarado Reyes</u>

Nora Idalia Alvarado Reyes ("Ms. Reyes") is a national of El Salvador. <u>See</u> Reyes Dec. ¶ 2 [#79-2]. She had never been to Matamoros before August 2019, when she was "returned" there with her two youngest children, and paperwork from the U.S. and Mexican governments. <u>Id.</u> at ¶¶ 10-11. Because they did not have shelter, Ms. Reyes and her two children slept on the sidewalk for the first three days and when it rained on the second night, they "huddled" under a "temporary canopy" and were still "soaked through." <u>Id.</u> at ¶¶ 12-13. They had to rely on help to get food. <u>Id.</u> at ¶ 14.

After a few days, Ms. Reyes, concerned by the "dangerous and difficult conditions," decided to travel three days by bus to Chiapas to stay with her sister. <u>Id.</u> at ¶ 16. Ms. Reyes and her children returned to Matamoros for their November 2019 hearing and camped out in front of

---

he wrote his first Declaration [#79-11B] in which he reported that during his "first visit to the Matamoros encampment in September 2019, food and potable water remained scarce, some individuals were defecating in an open field because the site lacked latrines, and…[he] witnessed a decomposing corpse wash up along the Mexican side of the Rio Grande where children were bathing and adults were washing clothing." Kizuka Supp. Dec. ¶ 44 [#79-11B]. On his return in January 2020, "the encampment had expanded onto the muddy banks of the Rio Grande to accommodate a growing population, while conditions improved little." <u>Id.</u> at ¶ 45. Moreover, "[a]s a result of overcrowding and poor sanitary conditions, disease is rampant" and "[a]ccess to food remains a problem, with doctors having treated pediatric patients suffering from severe-acute malnutrition, which increases the likelihood that an underfed child will die from flu, gastrointestinal infection, or other normally treatable conditions." <u>Id.</u> at ¶¶ 46-47 (internal citations omitted). Mr. Martin reports that in Matamoros, "the local authorities have failed to meet basic humanitarian standards for the population" and that these camps are a "high risk for becoming COVID-19 hotspots." Martin Supp. Dec. ¶¶ 11-12 [#79-12A]; see also First Martin Dec. ¶ 8 [#79-12B] ("Tamaulipas is among the most dangerous and violent regions in Mexico and migrants are particular targets. The criminal groups that control the state view migrants as a commodity and source of income and profit from each individual who passes through their territory. They deliberately pursue asylum seekers for kidnapping, extortion, and other forms of violence.").

the immigration building. Id. at ¶ 18. After the hearing, Ms. Reyes decided against returning to

Chiapas because the trip was long and dangerous, and their next hearing was scheduled for

January 2020. Id. at ¶ 19.

At the camp, Ms. Reyes and her children lived in a tent another migrant gave them. Id. at

¶ 20. Conditions in Matamoros had worsened; it was cold and wet, Ms. Reyes did not have much

money to buy food, and her children complained that they were hungry and cold. Id. Sometimes

people passed by Ms. Reyes' tent and called the migrants names, told them to go back to their

country, and complained that they were "dirty and . . . a plague for the city." Id. at ¶ 21.

After a few weeks living in the tent, Ms. Reyes, her children, and another woman left the

camp and found a house to rent in a different neighborhood. Id. at ¶ 22. One day, a dead body

was found near their house, and a few days after that, neighbors saw a woman running through

the street covered in blood. Id. Ms. Reyes thought that the woman was a migrant and heard that

she had escaped after having been kidnapped. Id. A neighbor told Ms. Reyes that she should lock

herself and her children inside their house and not come out; they were terrified and decided to

leave that neighborhood. Id. at ¶¶ 22-23. They went to a shelter, but it was full, so they began

living outside in the camp once more. Id. at ¶ 23.

There is a lot of violence at the camp; Ms. Reyes and her children have seen men beating

migrants with wooden planks. Id. at ¶ 24. She also knows of migrants who have been killed and

women who have been raped in the camp. Id. Ms. Reyes has seen bodies in the river multiple

times. Id. Because of the violence, Ms. Reyes feels unsafe using the bathroom at night and put

her children in diapers so they would not have to go to the bathroom at night. Id. at ¶ 26. Ms.

Reyes' children developed skin infections that lasted for months and caused bumps on her son's

arms and legs and a lesion to develop on her daughter's scalp. Id. at ¶ 29.

Ms. Reyes' third court date was set for March 2020 but was postponed due to the spread of the novel coronavirus. Id. at ¶ 31. Ms. Reyes' hearings continued to be postponed as the court closure continued; each time she traveled to the bridge she was told by U.S. officials that she could call a number on a piece of paper they handed to her to figure out when her next hearing would be. Id. In July 2020, there was a hurricane and the camp flooded. Id. at ¶ 28. Ms. Reyes feared that the river would crest and that the camp would be under water. Id.

Ms. Reyes crossed the border again in November 2020 and was apprehended by U.S. officials. Id. at ¶ 34. She was interviewed by a U.S. official about her fear of returning to Mexico and recounted her experiences living in the camp. Id. at ¶ 37. The immigration officials took her clothing and sent her back to the camp in "prison clothes." Id. at ¶ 38. Ms. Reyes remains in the camp. Id. at ¶ 40.[11]

> b.   María de la Cruz Abarca de López, her minor children, A.L., T.L., D.L., and her husband Hermes Arnulfo López Merino.

María de la Cruz Abarca de López ("Ms. Abarca"), her husband Hermes Arulfo López Merino ("Mr. López"), and their three children, A.L., T.L., and D.L., ages 13, 10, and 7, and are Salvadoran nationals. Abarca Dec. ¶ 1 [#79-4]. In September 2019, after spending time in two detention centers, they were "returned" to Matamoros, Mexico, a city they had never been to and in which they knew no one. Id. at ¶¶ 5-7; 9-10. While they were detained, U.S. officials threw away nearly all of their belongings, including their clothing. Id. at ¶¶ 3, 12. They spent their first night in Matamoros sleeping outside the tent of a woman who was worried for their safety. Id. at ¶¶ 11-12. Ms. Abarca was "terrified." Id. at ¶ 12. Ms. Abarca's daughters' health suffered in the camp; they were vomiting and feverish, and her eldest daughter, who had bronchitis, stopped

---

[11] The court has not taken into account additional information provided by Ms. Reyes under seal as that information is not necessary for purposes of this motion.

eating. Id. at ¶ 13. A man hit Ms. Abarca's eldest daughter "for no apparent reason," and when Mr. López reported it to a Mexican official, he was told it would be better not to complain. Id. at ¶ 14.

The family left the encampment and lived in a hotel for about a month, but when that became too expensive, they rented a small house in Matamoros. Id. at ¶¶ 15-16. All five family members sleep on wooden bedframes in the same room. Id. at ¶ 16. The weather has turned cold and because the roof has caved in in one of their rooms, the family is exposed to the elements. Id. at ¶¶ 16-17. They often hear gunshots throughout the day. Id. at ¶ 18.

Mr. López worked in a carpentry shop for about a year. Id. at ¶ 19. Because he was a foreigner, he was expected to perform the most strenuous tasks and was only paid about ten dollars a day. Id. Even with Mr. López's job and some money from his family, they did not have enough money for food. Id. at ¶¶ 20-21. Mr. López was fired from his job in December 2020 and without his wages, the family is unable to cover expenses and struggles to buy food. Id. at ¶¶ 27-28. Ms. Abarca and her daughters do not leave the house because it is not safe outside. Id. at ¶¶ 22-24.

The family has had two court dates. Id. at ¶ 25. At their first, after they told the judge they were afraid of returning to Mexico, they were referred to a separate phone interview where they explained why they were afraid to return. Id. They were returned. Id. During their second hearing, in March 2020, Mr. López asked the judge to permit his family to wait in the United States until there was a decision, but the judge denied his request. Id. at ¶ 26. Ms. Abarca worries about her family's safety every day; she struggles to sleep, and her hair has started to fall out. Id. at ¶ 29. Her daughters are getting thinner and have barely left the house for a year. Id.

c.    <u>Miriam Yanett Zuniga Posadas</u>

Miriam Yanett Zuniga Posadas ("Ms. Zuniga") is a national of Honduras. <u>See</u> Zuniga

Dec. ¶ 2 [#79-6]. After she and her children crossed the border, they were detained and placed in

Immigration and Customs Enforcement custody for about four days. <u>Id.</u> at ¶ 6. During that time,

Ms. Zuniga tried to explain to immigration authorities that she fled Honduras because she feared

for her life, but immigration officials did not listen to her and berated her for entering the United

States illegally. <u>Id.</u> at ¶ 5. She was told she would have a hearing before a judge who would

determine whether they would remain in the United States or be sent back to Mexico, but she

never had the hearing and when she asked an official about it she was told to "shut up." <u>Id.</u> Later,

she, her five-year-old twin boys, and her sixteen-year-old daughter were "returned" to Nuevo

Laredo, a city in which they had never been and did not know anyone. <u>Id.</u> at ¶¶ 2, 6, 8, 10. When

Ms. Zuniga asked Mexican officials at the border where she should go, she was told it was her

"problem" to figure out. <u>Id.</u> at ¶ 11.

Almost immediately after they left the Mexican immigration building, Ms. Zuniga and

her children were approached by a group of men armed with large guns. <u>Id.</u> at ¶ 13. The men

took Ms. Zuniga's money and her children's clothing and pulled the tennis shoes from her sons'

feet. <u>Id.</u> at ¶ 14. They demanded that Ms. Zuniga tell them where she and her children were from.

<u>Id.</u> After the armed men took their things and threatened them, a pastor intervened, and the

armed men left. <u>Id.</u> at ¶ 15. The pastor told Ms. Zuniga that the men were from a cartel and that it

was not safe for Ms. Zuniga and her family to be out in the open near the immigration building.

<u>Id.</u> ¶ 17. Ms. Zuniga and her children went to a shelter where they were advised they should

never go outside because if they did, "[b]ad people would take" them. <u>Id.</u> at ¶¶ 18-19. Members

of the cartel have invaded the shelter twice. <u>Id.</u> at ¶ 43.

Since they were "returned" to Nuevo Laredo, members of the cartel have tried to kidnap her children twice. Id. at ¶ 21. The first attempt happened while they were on their way to their first court appearance in early February 2020. Id. at ¶ 23. Ms. Zuniga was holding one of her son's hands and her daughter was holding her other son's hand and a group of men approached her daughter and tried to pull her son away. Id. Her daughter screamed, and Ms. Zuniga turned around and reached for her daughter and son. Id. at ¶¶ 23-24. She shouted at the men and told her daughter to take both of her sons and run towards the immigration building. Id. at ¶ 24. Ms. Zuniga tried to run, but the men grabbed her backpack and she could not get away. Id. at ¶ 25. The men dispersed when several Mexican officials came towards Ms. Zuniga and she was escorted by the officials to the Mexican immigration building. Id.

During the hearing that followed, Ms. Zuniga tried to explain to the judge all that had happened since her family was "returned" to Nuevo Laredo, but they judge asked her only "yes" or "no" questions. Id. at ¶¶ 26-27. After the hearing, Ms. Zuniga had a phone interview and was told that this interview would decide whether she and her family would return to Mexico or stay in the United States. Id. at ¶ 28. Ms. Zuniga tried to explain that she was afraid of returning to Mexico and was afraid of what the cartels would do to her and her children if they had to go back. Id. at ¶ 29. She was told they would have to return to Mexico. Id. at ¶ 30. They spent the night in a detention center and were not given food. Id.

The next morning, Mexican immigration officials told Ms. Zuniga that they needed to leave the facility. Id. at ¶ 32. The officials tried to get all of the migrants in the building outside, but Ms. Zuniga tried to stay inside as long as possible. Id. While they were inside, Ms. Zuniga and her family watched as the cartel kidnapped families who had just exited the Mexican immigration building. Id. at ¶ 33. Ms. Zuniga protested being forced out of the building and,

eventually, the Mexican immigration officials allowed them to stay in a different office building overnight. Id. at ¶ 35. They left the building the next morning with a pastor and a group of other migrants. Id. at ¶ 36. As they were driving, the car was stopped by cartel members and the cartel took some people from the car. Id. at ¶¶ 36-38.

In September 2020, as Ms. Zuniga and her children were returning from renewing their permits at the Mexican immigration building, they were again "surrounded" by members of the cartel. Id. at ¶ 44. The men asked them where they were from and what they were doing in Nuevo Laredo and touched Ms. Zuniga's daughter's face and told her she was beautiful. Id. Her daughter was "crying and shaking." Id. While this was happening, a man and woman approached in a car and the men left. Id. at ¶ 46. The man from the car told Ms. Zuniga to get her children out of Mexico because the cartel had taken over and if they stayed, they would be killed. Id. at ¶¶ 46-47. Ms. Zuniga is still in the shelter and is terrified that men from the cartel will break in again and kidnap her. Id. at ¶ 50.[12]

IV.   Legal Standard

A preliminary injunction is an "extraordinary remedy never awarded as of right," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008), appropriate where a plaintiff demonstrates that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20.

---

[12] The court has not taken into account additional information provided by Ms. Zuniga under seal as that information is not necessary for purposes of this motion.

V.    <u>Analysis</u>

   A.  <u>The First Preliminary Injunction</u>

Plaintiffs argue that the court's <u>Memorandum and Order</u> [#45] granting Plaintiffs' first

<u>Motion for Preliminary Injunction</u> [#27] is law of the case, Memorandum in Support of Second

Preliminary Injunction ("Mem. in Supp. of Sec. PI") 14-15 [#78], while Defendants argue that

"intervening changes in controlling law have undermined" Plaintiffs arguments and the court

"should reconsider its prior conclusion." Opposition to Plaintiffs' Second Motion for a

Preliminary Injunction ("Opp'n to Sec. PI") 5-6 [#88].

   "Under the law of the case doctrine, 'unless corrected by an appellate tribunal, a legal

decision made at one stage of a civil or criminal case constitutes the law of the case throughout

the pendency of the litigation.'" <u>Latin Am. Music Co. Inc. v. Media Power Grp., Inc.</u>, 705 F.3d

34, 40 (1st Cir. 2013) (quoting <u>Flibotte v. Pa. Truck Lines, Inc.</u>, 131 F.3d 21, 25 (1st Cir. 1997).

"This means that a court ordinarily ought to respect and follow its own rulings, made earlier in

the same case." <u>Ellis v. United States</u>, 313 F.3d 636, 646 (1st Cir. 2002). Reconsideration may be

appropriate "if the initial ruling . . . was designed to be preliminary" or "if there has been a

material change in controlling law." <u>Id.</u> at 647-48.

   Here, the First Circuit has not ruled on Defendants' appeal and the Supreme Court is

holding <u>Innovation Law Lab</u> in abeyance. Accordingly, the court's decision is law of the case,

and much of the court's prior analysis is repeated herein. See <u>Latin Am. Music</u>, 705 F.3d at 40.

At the same time, the decision on a motion for a preliminary injunction is by definition

preliminary, and accordingly, the court considers carefully the decisions cited by Defendants to

determine whether they amount to a "material change in controlling law." Ellis, 313 F.3d at 648. The court provides analysis of Plaintiffs' Second Motion for Preliminary Injunction [#77] below.

      B.  Likelihood of Success on the Merits

The court turns to Plaintiffs' likelihood of success on the merits, which "is the main bearing wall of the four-factor framework." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). The Plaintiffs raise several claims, but the court finds it unnecessary to proceed beyond the statutory arguments.

      1.  The Statutory and Regulatory Scheme Applicable to "Applicants for Admission"

The Immigration and Nationality Act ("INA"), as amended, lays out the main statutory scheme for our nation's immigration laws. See 8 U.S.C. § 1101 et seq. Section 235 of the INA, codified at 8 U.S.C. § 1225, addresses the processing of certain noncitizens considered "applicants for admission." An "applicant for admission" is an "alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." 8 U.S.C. § 1225(a)(1). "The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." Id. § 1101(13)(C). The term "arriving alien" refers "to an individual who (1) attempted entry at a port of entry but was not admitted, (2) was interdicted at sea, or (3) was paroled into the United States. 8 C.F.R. § 1.2.

8 U.S.C. § 1225(b) is entitled "Inspection of applicants for admission." Its first paragraph, § 1225(b)(1), is entitled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," and provides in relevant part:

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien . . . who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C)[13] or 1182(a)(7)[14] of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien . . . who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution,[15] the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

**(iii) Application to certain other aliens**

**(I) In general**

The Attorney General[16] may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.

**(II) Aliens described**

An alien described in this clause is an alien who . . . has not been admitted

---

[13] 8 U.S.C. § 1182(a)(6)(C) makes inadmissible an alien who by fraud misrepresents a material fact to obtain admission into the United States.

[14] 8 U.S.C. § 1182(a)(7) makes inadmissible an alien not in possession of a valid visa, reentry permit, or other valid entry document.

[15] Under 8 U.S.C. § 1158(b)(1)(B)(i), asylum applicants must establish that they are "refugees" within the meaning of 8 U.S.C. § 1101(a)(42)(A) by establishing "that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant[s]." This definition draws upon the 1967 Protocol Relating to the Status of Refugees, to which the United States is a party, and which incorporates Article 33 of the 1951 Convention Relating to the Status of Refugees, which states that: "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[16] Although the statute allocates this authority to the Attorney General, Congress has transferred this authority to the Secretary of Homeland Security. See 6 U.S.C. §§ 251, 552(d); Clark v. Suarez Martinez, 543 U.S. 371, 374 n.1 (2005). The court reads the text of the statute accordingly.

or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

**(B) Asylum Interviews**

**(i) Conduct by asylum officers**

An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

**(ii) Referral of certain aliens**

If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), [ [17] ] the alien shall be detained for further consideration of the application for asylum.

**(iii) Removal without further review if no credible fear of persecution**

**(I) In general**

Subject to subclause (III), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

…

**(v) "Credible fear of persecution" defined**

For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.

---

[17] Under the implementing regulations at 8 C.F.R. § 208.30(d), "[t]he purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." The inclusion of "torture" keeps the United States in line with its duty under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), to which it is a party, and which provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." See Matter of G-A-, 23 I & N Dec. 366, 367 (BIA 2002) ("Article 3 of the Convention Against Torture prohibits refoulement of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official"). The regulations provide that "an alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17." 8 C.F.R. § 208.30(e)(3).

…

**(E) "Asylum officer" defined**

As used in this paragraph, the term "asylum officer" means an immigration officer who--

(i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 1158 of this title, and

(ii) is supervised by an officer who meets the condition described in clause (i) and has had substantial experience adjudicating asylum applications.

…

8 U.S.C. § 1225(b)(1).

Subsection (b)'s second paragraph, "Inspection of other aliens," in turn, provides in relevant part:

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien--

**(i)** who is a crewman,

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2).[18]

---

[18] The third paragraph, entitled "Challenge of Decision," see 8 U.S.C. § 1225(b)(3), is not relevant here.

2.      Whether the New Returned Plaintiffs Were "Arriving" When They Were
          Apprehended

Plaintiffs argue that, under the MPP, the contiguous return provision found at 8 U.S.C.

§ 1225(b)(2)(C) was improperly applied to Ms. Reyes, Ms. Abarca, Mr. López, A.L., T.L., D.L.,

and Ms. Zuniga as they are "similarly situated" to the Returned Plaintiffs who were the subject

of the first motion for a preliminary injunction. Mem. in Supp. of Sec. PI 14 [#78]; see also

Mem. & Order [#45]. Defendants do not dispute that the New Returned Plaintiffs were

apprehended after they crossed the border but contend that the New Returned Plaintiffs were

nonetheless "arriving" as the term is used in § 1225. Opp'n to Sec. PI 4-6 [#88].[19]

In its Memorandum and Order [#45] granting Plaintiffs' Motion for Preliminary

Injunction [#27], the court explained that the statutory provisions reflected a longstanding

distinction in our immigration law between noncitizens who have entered the United States, even

if unlawfully, and those who remain at the threshold. Mem. & Order 14-18 [#45], (citing

Zadvydas v. Davis, 553 U.S. 678, 693 (2001) ("The distinction between an alien who has

effected an entry into the United States and one who has never entered runs throughout

immigration law."); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)

(distinguishing between "aliens who have once passed through our gates, even illegally" and "an

alien on the threshold of initial entry")).

In DHS v. Thuraissigiam, the Supreme Court affirmed this longstanding distinction, but

explained that an alien who had crossed into the United States and was apprehended 25 yards

from the border was still on the threshold and had not yet entered the United States. 140 S. Ct.

---

[19] Plaintiffs' Immigration Charging Documents [#79-7] do not indicate whether the Plaintiffs are
"arriving alien[s]," "alien[s] present in the United States who has not been admitted or paroled,"
or "admitted to the United States, but [ ] removable for reasons stated below." Id. 2, 4, 6, 8, 10,
12, 14, 17.

1959, 1965, 1982-83 (2020). The Court determined that this minimal border-crossing did not amount to "effect[ing] an entry." Id. at 1982 (citing Zadvydas, 533 U.S. at 693). Accordingly, aliens like Thuraissigiam, who are apprehended shortly after crossing, may be treated "as if stopped at the border." Id. (citing Mezei, 345 U.S. at 215). At the same time, although some passage of time or distance may thus be needed to effect a border crossing, Thuraissigiam does not undermine the overall distinction in immigration law between noncitizens who have entered the interior of the United States, even if unlawfully, and those who remain at or near the threshold.

The Defendants also argue that a recent Board of Immigration Appeals ("the Board") decision reinforces that the government's action was reasonable and lawful." Opp'n to Sec. PI 9 [#88] (citing in Matter of M-D-C-V-, 28 I & N Dec. 18 (BIA 2020)). In Matter of M-D-C-V-, the Board upheld the application of the MPP to a particular alien deciding "only . . . whether the respondent, who was apprehended just inside the border . . . was properly considered to be 'arriving.'" 28 I & N Dec. at 23. The applicant for admission in Matter of M-D-C-V- was served with Form I-261 which stated she was "an arriving alien." Id. at 19. The Board determined that CBP's initial determination that the migrant was "arriving" was correct. Id. at 23. Although the decision stands for the proposition that "just inside the border" is still arriving, it does not undermine the notion that the statutory scheme distinguishes between those who are arriving, and those, a bit further away from the border, who are no longer arriving, and have entered the United States, albeit unlawfully.

The New Returned Plaintiffs may well be able to establish that they had entered the United States before they were apprehended. Notably, CBP left the immigration documents blank and did not mark the New Returned Plaintiffs as "arriving." See Immigration Charging

21

Documents 2, 4, 6, 8, 10, 12, 14, 17 [#79-7]. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168); Dugan v. Ramsay, 727 F.2d 192, 196 (1st Cir. 1984) (same); cf. Natural Resources Defense Council, Inc. v. U.S. E.P.A, 824 F.2d 1258, 1286 n.19 (1st Cir. 1987) ("Reviewing courts will not rely on appellate counsel's post hoc rationalizations in lieu of adequate findings or explanations from the agency itself."). Nonetheless, the record is not clear, and accordingly, the court turns to the next statutory argument.

3.   Whether the New Returned Plaintiffs Are Applicants for Admission as Specified in 8 U.S.C. § 1225(b)(1) to Whom 8 U.S.C. § 1225(b)(2) Does Not Apply

Plaintiffs contend that the New Returned Plaintiffs are not noncitizens "described in subparagraph (A)," that is, § 1225(b)(2)(A), to whom the contiguous return authority may be applied, see 8 U.S.C. § 1225(b)(2)(C), but, rather, are explicitly excluded from the group of "other aliens" described in § 1225(b)(2)(A) because they are applicants "to whom paragraph (1) applies." Mem. in Supp. of Sec. PI 15-17 [#78] (citing 8 U.S.C. § 1225(b)(2)(B)(ii)). Defendants argue that "Section 1225 does not set up immutable, fixed categories of aliens" and that, instead, DHS has "inherent prosecutorial discretion" to choose "whether to apply § 1225(b)(1)'s expedited removal procedure to a particular 'applicant for admission,' or whether instead . . . to afford him or her a full removal proceeding under § 1225(b)(2)(A)." Opp'n to Sec. PI 16 [#88]. It remains Defendants' view that DHS's discretion to put applicants for admission in "full removal proceedings under § 1555(b)(2)" allows DHS to apply the contiguous return provision to the New Returned Plaintiffs because they have the "salient identifying features" of § 1225(b)(2). Id. at 15-16.

Section 1225(b) differentiates between the "inspection" of applicants for admission

described in (b)(1) and those described in (b)(2). <u>See</u> <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830, 837 (2018) ("applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)"). A section (b)(1) applicant is one who is "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. <u>Id.</u> (citing § 1225(b)(1)(A)(i) and 8 U.S.C. §§ 1182(a)(6)(C) and 1182(a)(7)). When such applicants are "arriving in the United States," § 1225(b)(1), they are placed into what are known as "expedited removal" proceedings unless they express a fear of persecution or an intention to claim asylum, 8 U.S.C. §§ 1225(b)(1)(A)(i) and 1225(b)(1)(A)(ii), or the Secretary of Homeland Security exercises prosecutorial discretion and places them into "standard" removal proceedings under 8 U.S.C. § 1229a. <u>See</u> <u>Matter of E-R-M- and L-R-M-</u>, 25 I. & N. Dec. 520, 523-24 (BIA 2011); <u>see also</u> <u>Matter of M-S-</u>, 27 I. & N. Dec. 509, 510 (BIA 2019); <u>Innovation Law Lab</u>, 951 F.3d at 1084. The Secretary of Homeland Security may also elect to process through "expedited removal" any (b)(1) noncitizens who are present in the United States without having been admitted or paroled and who cannot affirmatively demonstrate that they have been continuously present in the country for two years. 8 U.S.C. §§ 1225(b)(1)(A)(i) and (iii).

A section (b)(2) applicant is, as the statute puts it, an "other alien []." 8 U.S.C. § 1225(b)(2). Section (b)(2) "serves as a catchall provision" and "applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)." <u>Jennings</u>, 138 S. Ct. at 837; <u>see also</u> 8 U.S.C. §1225(b)(2)(B)(ii). "Other aliens" includes aliens present in the United States who have not been admitted or paroled and who are inadmissible for reasons other than fraud, misrepresentation, or lack of valid documentation, or who can demonstrate that they have been present in the United States for more than 2 years, and arriving aliens who are

inadmissible for reasons other than fraud, misrepresentation, or lack of valid documentation.[20] 8

U.S.C. § 1225(b)(1)(A). Any section (b)(2) applicants who are "not clearly and beyond a doubt

entitled to be admitted" are processed not through "expedited removal" proceedings, but through

standard removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(2)(A).

Defendants argue that because none of the New Returned Plaintiffs were placed in

expedited removal proceedings, § 1225(b)(1) does not apply to them. Opp'n to Sec. PI 16 [#88].

In other words, because the government placed the New Returned Plaintiffs in § 1229a removal

proceedings, they are subject to contiguous return under § 1225(b)(2)(C) regardless of the text of

§ 1225(b)(2)(b)(ii). Id. Defendants misstate the issue; Section (b)(1) applicants are not defined

by the proceedings to which they are ultimately subject to, but rather, by their status as

noncitizens arriving or present in the United States for less than two years whom "an

immigration officer determines . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7)."

See Jennings, 138 S. Ct. at 837 ("Section 1225(b)(1) applies to aliens initially determined to be

inadmissible due to fraud, misrepresentation, or lack of valid documentation"). The Defendants

provide no statutory language authorizing the government to re-categorize an applicant for

admission between (b)(1) and (b)(2) and the court to decline to read in such an authorization.

DHS has the authority to, by an exercise of discretion, place arriving aliens who are not

authorized to be in expedited or full removal proceedings, § 1225(b)(1)(A)(iii), but (b)(1) and

---

[20] Other grounds include having a significant communicable disease, 8 U.S.C.
§ 1182(a)(1)(A)(i), having been determined to be a drug addict, 8 U.S.C. § 1182(a)(1)(A)(iv),
having been convicted of a felony involving moral turpitude or controlled substances, 8 U.S.C.
§ 1182(a)(2)(A)(i), having been convicted of crimes with aggregate sentences of confinement of
5 years or more, 8 U.S.C. § 1182(a)(2)(B), having engaged in human trafficking, 8 U.S.C.
§ 1182(b)(2)(H), having engaged in money laundering, 8 U.S.C. § 1182(b)(2)(I), having engaged
in terrorist activity, 8 U.S.C. § 1182(b)(3)(B), having participated in genocide, 8 U.S.C.
§ 1182(b)(3)(E), and so on.

(b)(2) are different groups. The New Returned Plaintiffs, who were determined to be

inadmissible under 8 U.S.C. § 1182(a)(7) because they lacked valid entry documents, are § (b)(1)

applicants.[21] See Mem. in Supp. of Sec. PI 16 [#78].

Moreover, while the DHS does, indeed, have the discretion to place § (b)(1) applicants

into standard § 1229a removal proceedings, see Matter of E-R-M- and L-R-M-, 25 I. & N. Dec.

at 523-24; see also Matter of M-S-, 27 I. & N. Dec. at 510; Innovation, 951 F.3d at 1084, it does

not do so "under" or "pursuant to" § 1225(b)(2). In Matter of E-R-M- and L-R-M-, the Board

held only that the DHS has the discretion to place § (b)(1) noncitizens into standard § 1229a

removal proceedings, not that such placement is pursuant to § 1225(b)(2). The Board interprets

the § 1225(b)(2)(B) "exception" to the group of noncitizens to whom § 1225(b)(2)(A) applies to

mean that the "three classes of aliens" excepted, "including those subject to expedited removal

under section [1225](b)(1)(A)(i), are not *entitled* to a section [1229a] proceeding, *not* that these

classes of aliens may not be placed in such proceedings," and that "aliens like the respondents

who are subject to section [1225](b)(1)(A)(i)...may nevertheless be placed in section [1229a]

proceedings at the election of the DHS." Matter of E-R-M- and L-R-M-, 25 I. & N. Dec. at 523-

24 (emphasis in original). As the 9th Circuit affirmed, "the fact that an applicant is in removal

proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant

does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal

---

[21] The New Returned Plaintiffs are (b)(1) applicants whether they are considered to have been "arriving" or "present" for less than two years without having been admitted or paroled at the time of their apprehension. See 8 U.S.C. § 1225(b)(1)(A)(i) (including a noncitizen who is "arriving in the United States or is described in clause (iii)"); 8 U.S.C. § 1225(b)(1)(A)(iii)(II) ("An alien described in this clause is an alien...who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph").

proceeding under § 1229a." Innovation, 951 F.3d at 1084.

Because the New Returned Plaintiffs are applicants for admission described in § (b)(1), they are not subject to the contiguous return provision at 8 U.S.C. § 1225(b)(2)(C), which applies only to applicants for admission described in § (b)(2)(A).[22] They are, thus, likely to succeed on the merits of their claim that their inclusion in the MPP is in violation of the INA for this reason.[23]

### A.     Irreparable Harm, Equities, and the Public Interest

Having found that Plaintiffs are likely to succeed on the merits, the court turns to the three other factors relevant to the issuance of a preliminary injunction. See Winter, 555 U.S. at 20.

First, the New Returned Plaintiffs are likely to suffer irreparable harm if Defendants are not enjoined from maintaining their "return" to Mexico under the MPP. Ms. Reyes, Ms. Abarca, and Ms. Zuniga have all submitted sworn declarations attesting to the ongoing hardships and extreme dangers they face, and, in the case of Ms. Abarca, her three young children face, as they

---

[22] Put another way, because the New Returned Plaintiffs are applicants "to whom paragraph (1) applies" such that "[s]ubparagraph (A) shall not apply" to them, see 8 U.S.C. § 1225(b)(2)(B)(ii), the provision addressing the return to a contiguous territory of "an alien described in subparagraph (A)" does not apply to them. See 8 U.S.C. § 1225(b)(2)(C).

[23] Plaintiffs also argue that extant regulations limit the contiguous return authority to (b)(2) noncitizens arriving at ports-of-entry, Mem. in Supp. of Sec. PI 17-19 [#79], that implementing the MPP without notice-and-comment rulemaking violated the Administrative Procedure Act, Id. at 20-21, that the MPP is arbitrary and capricious in violation of the Administrative Procedure Act, Id. at 21-24, that the MPP is motivated by animus in violation of the Constitution's equal protection guarantee, Id. at 25-26, and that requiring the New Returned Plaintiffs to remain in Mexico for the pendency of their removal proceedings violates the duty of non-refoulement. Id. at 26-28. The court does not reach these arguments. Whether implementing the MPP without notice-and-comment rulemaking violated the Administrative Procedure Act and whether requiring migrants to remain in Mexico for the pendency of their removal proceedings violates the duty of non-refoulement is before the Supreme Court in Innovation Law Lab, No. 19-1212 and the court declines to address this issue here.

struggle to survive in Matamoros and Nuevo Laredo, Tamaulipas, Mexico. See Reyes Dec. [#79-2]; Abarca Dec. [#79-4]; Zuniga Dec. [#79-6]. While she waits for her removal proceedings to progress, Ms. Reyes is in a state of constant fear due to the violence in and around the camp, feels unsafe using the bathrooms at night, and lacks adequate heat and sufficient food. Reyes Dec. at ¶¶ 25-27 [#79-2]. Ms. Abarca reports that she and her young daughters never leave the house because they fear they are in danger outside. Abarca Dec. ¶¶ 22, 29, 30. [#79-4]. Her daughters are getting thinner and she is worried about their health. Id. at ¶ 29. Also, the home that Ms. Abarca and her family have been living in is being sold on February 20, 2021 and they do not know whether they will have a place to live after that date. Letter re Preliminary Injunction n.1 [#94]. Temperatures in Matamoros, where Ms. Reyes and the Abarca family are, are forecasted to drop to a low of 26 degrees on February 16, 2021. Id. This is colder than the lowest recorded temperature in Matamoros since the beginning of the MPP. Id. (citing Past Weather in Matamoros, Tamaulipas, Mexico, timeanddate.com/weather/Mexico/matamoros/historic). In Nuevo Laredo, Ms. Zuniga is living in a shelter where she fears she will be kidnapped by cartel members because she has seen such kidnappings happen and fears that if she stays in Mexico, her "children will no longer have their mother." Zuniga Dec. ¶¶ 43, 50 [#79-6]. Their personal accounts are unrebutted[24] and are supported by affidavits from employees of two nongovernmental organizations[25] and the U.S. State Department's assignment to Tamaulipas of a

---

[24] Defendants note that Plaintiffs were "not found to be more likely that not to face persecution on account of a protected ground or tortured if returned to Mexico." Opp'n to Sec. PI 27 [#88]; see also Assessment Notice [#79-9] (provided to Ms. Reyes after her November 9, 2020 "nonrefoulement interview," on which a box is marked next to the statement "You did not establish a clear probability of persecution or torture in Mexico"). The court can accord the interviewer's determination little weight here where Defendants have not stated what information was considered by the interviewer in reaching those conclusions and have offered no written or other record of the interview for the court to review.

[25] The observations about the vulnerability of migrants like the New Returned Plaintiffs in

"Level 4: Do Not Travel" warning "due to crime and kidnapping." See "State Dep't Advisory."

U.S. government employees are prohibited from being outside in Matamoros and Nuevo Laredo

between midnight and 6 a.m. Id. Furthermore, since March 2020, MPP proceedings have been

indefinitely postponed due to the COVID-19 pandemic and New Returned Plaintiffs are unlikely

to proceed with their immigration proceedings. See, e.g., Supplemental Declaration of Kennji

Kizuka, Senior Researcher and Policy Analyst at Human Rights First 2-3 [#79-11A];

Supplemental Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in

Mexico 2-3 [#79-12A].

Defendants contend that Plaintiffs' "delay in seeking relief severely undermines their

claims of irreparable harm." Opp'n to Sec. PI 30 [#88]. The court finds no such delay.[26]

The court notes recent news reports describing DHS's plan to begin a new asylum

---

Tamaulipas, and in Matamoros and Nuevo Laredo in particular, contained in the Supplemental Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico [#79-12A] and the Supplemental Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First [#79-11] corroborate the New Returned Plaintiffs' accounts of their own experiences. For example, Mr. Kizuka describes the "escalating dangers and unconscionable conditions" in the migrant encampment in Matamoros and Nuevo Laredo which have "grown even more dire" than in reported in his previous Declaration. Kizuka Supp. Dec. 4-6 [#79-11A]; see also Declaration of Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First ("First Kizuka Dec") [#79-11B]. Mr. Martin reports that in Matamoros, the "population of the camp has endured constant fear from organized crime" and that Doctors Without Borders has "recorded 13 victims of sexual violence" and that the "vulnerability of asylum seekers and migrants has not changed" since the date of his first declaration.  Martin Supp. Dec. ¶¶ 1, 8 [#79-12A]; see also Declaration of Sergio Martin, General Coordinator for Doctors Without Borders in Mexico ("First Martin Dec.") ¶ 43 [#79-12B] (Staff has received direct reports of numerous violent incidents involving migrants and asylum seekers. These include cases of sexual violence, robbery, verbal harassment of migrants by the local community, attempted kidnapping, disappearance and murder of migrants after leaving the camp, and violent aggression with weapons. [They] have also witnessed cartel watchmen observing migrants."). Defendants have filed nothing that contradicts these accounts.

[26] New Returned Plaintiffs filed joined the Amended Complaint [#73] on December 22, 2020 and the Second Motion for Preliminary Injunction was filed on December 25, 2020. The court finds no evidence of delay between Plaintiffs' filing of their Amended Complaint [#73] and their Motion for Preliminary Injunction [#77].

process to allow about 300 asylum seekers a day into the United States. Alana Wise, <u>Biden Team</u> <u>Unveils New Asylum System to Replace Trump's 'Remain in Mexico'</u>, Nat'l Pub. Radio (February 12, 2021), https://www.npr.org/2021/02/12/967201293/biden-team-unveils-new-asylum-system-to-replace-trumps-remain-in-mexico. While this development may result in the New Returned Plaintiffs' admission into the United States, it is unclear when that may occur. The New Returned Plaintiffs have demonstrated that they face daily peril such that there is a high likelihood they will suffer irreparable harm should the preliminary injunction not issue.

The court further finds that the balance of equities tips in favor of granting Plaintiffs' request for a preliminary injunction and that such a grant is in the public interest. Moving the New Returned Plaintiffs out of the constant danger they face outweighs the government's or the public's interest in the keeping these seven noncitizens in Mexico, in light of the likelihood of success of Plaintiffs' claim that the MPP is inconsistent with 8 U.S.C. § 1225 as it applies to the New Returned Plaintiffs.

VI.     <u>Conclusion</u>

Accordingly, Plaintiffs' <u>Second Motion for Preliminary Injunction</u> [#77] is GRANTED in part. The Department of Homeland Security shall promptly rescind the orders returning Ms. Reyes, Ms. Abarca, Mr. López, A.L., T.L., D.L., and Ms. Zuniga to Mexico and shall permit their re-entry into the United States for the pendency of their immigration removal proceedings. The court leaves to the Department in the first instance the determination whether parole or detention is appropriate once the New Returned Plaintiffs are inside the United States and expresses no opinion as to the authority under which the New Returned Plaintiffs might be detained. The court does not reach Plaintiffs' other arguments or alternative request that the New Returned Plaintiffs be provided with an assessment of their fear of remaining in Mexico that

follows the procedures and standard for "reasonable fear interviews." Mem. in Supp. of Sec. PI

36 [#78].[27]


IT IS SO ORDERED.

Date:   February 13, 2021                                          /s/ Indira Talwani
                                                                         United States District Judge

---

[27] The court notes, however, that a cursory review highlights why MPP's "nonrefoulement" interviews described above may be inadequate and in any event, differ substantially from the "reasonable fear" interview process set forth under the regulations, where noncitizens subject to the "reinstatement" of a previous removal order or "administrative removal" as the result of certain criminal convictions, see 8 C.F.R. § 208.31(a), are evaluated to determine whether they should be referred to an immigration judge "for full consideration of the request for withholding of removal [under section 241 of the Immigration and Nationality Act or the Convention Against Torture] only." 8 C.F.R. § 208.31(e). First, to be referred to an immigration judge, a noncitizen must establish only a "reasonable possibility" of persecution or torture, see 8 C.F.R. § 208.31(c), while MPP's interviews require a "more likely than not" showing. USCIS Guidance for Implementing MPP 4 [#36-3]. Under the "reasonable fear" procedures, noncitizens "may be represented by counsel…and the alien's representative may present a statement at the end of the interview," 8 C.F.R. § 208.31(c), while DHS "is currently unable to provide access to counsel" during primary or secondary inspection under MPP "given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals." USCIS Guidance for Implementing MPP 4 [#36-3]. The "reasonable fear" regulations require that a record of the interview be created and reviewed with the noncitizen. 8 C.F.R. § 208.31(c) ("The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct errors therein. The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officers, and the officer's determination of whether, in light of such facts, the alien has established a reasonable fear of persecution or torture."). No record is required for the MPP interviews. Under the "reasonable fear" procedure, asylum officers' negative fear determinations are reviewable by immigration judges, 8 C.F.R. § 208.31(g), while the assessment under MPP "shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion," but there is no "further administrative review, reopening, or reconsideration of the assessment by USCIS." USCIS Guidance for Implementing MPP 5 [#36-3].